1  THE WEISER LAW FIRM, P.C.
   KATHLEEN A. HERKENHOFF (168562)
2  12707 High Bluff Drive, Suite 200
   San Diego, CA 92130
3  Telephone:  (858) 794-1441
   Facsimile:  (858) 794-1450
4  kah@weiserlawfirm.com

5  Attorney for Plaintiff

6  (Additional counsel listed on signature page)

7

**Filed**

APR 1 0 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                   **SAN JOSE DIVISION**

12  JUDY WANG, Derivatively on Behalf of      )   Case No. CV12-01785
    GOOGLE INC.,                              )
13                                            )   VERIFIED SHAREHOLDER DERIVATIVE
                        Plaintiff,            )   COMPLAINT FOR BREACH OF
14                                            )   FIDUCIARY DUTY, GROSS
         vs.                                  )   MISMANAGEMENT, ABUSE OF
15                                            )   CONTROL AND UNJUST ENRICHMENT
    LARRY PAGE, SERGEY BRIN, ERIC E.          )
16  SCHMIDT, L. JOHN DOERR, JOHN L.           )
    HENNESSY, ANN MATHER, PAUL S.             )
17  OTELLINI, K. RAM SHRIRAM, SHIRLEY         )
    M. TILGHMAN, NIKESH ARORA and             )
18  PATRICK PICHETTE,                         )
                                              )
19                      Defendants,           )
                                              )
20       – and –                              )
                                              )
21  GOOGLE INC.,                              )
                                              )
22                      Nominal Party.        )
    ─────────────────────────────────────────
23
                          DEMAND FOR JURY TRIAL
24

25

26

27

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.       Plaintiff Judy Wang ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Google Inc. ("Google" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2.       According to its public filings, Google is the world's largest internet search and technology company, focusing on organizing the world's information and making it universally accessible and useful.  Google generates revenues primarily by offering various advertising services that permit advertisers (including Canadian online pharmacies) to post their advertising message and a link to their website above and next to search results in response to search queries relevant to the advertiser.

3.       The Company's largest advertising program, AdWords, displays sponsored advertisements in response to queries by the Company's search engine users.[1]  In addition, advertisers are able to "geo-target" their advertising campaigns, selecting the specific countries where the advertisements will display.   In return for these services, advertisers pay fees to Google for each advertisement.

4.       Notably, as a corporation headquartered and operating in the U.S., Google is subject to all U.S. federal laws. Enacted by the U.S. Congress in 1938, the Federal Food, Drug, and Cosmetic Act (the "FDC Act") gives authority to the U.S. Food and Drug Administration (the "FDA") to oversee the

---

[1] AdWords allows a potential advertiser to create text or image-based ads and display them online in a targeted manner.  The Company has created an advertising algorithm designed to target ads according to their relevance.  Essentially, when a user enters a search into Google, these relevant ads appear beside the search results.  Most advertisers pay Google on a "cost-per-click" basis, meaning the more a person clicks on an ad, the more Google is paid.  Google does, however, also offer a "cost-per-impression" basis, where an advertiser will pay the Company based on the number of times their ads appear on Google's websites.

safety of food, drugs, and cosmetics.  Among other things, the FDC Act prohibits the introduction or delivery for introduction of any drug into interstate commerce, or the causing thereof.  In almost all circumstances, the shipment of prescription drugs from pharmacies outside of the U.S. violates the FDC Act.  Similarly, the Controlled Substances Act (the "Substances Act"), which was enacted by the U.S. Congress in 1970, prohibits such conduct with regard to controlled prescription drugs.[2]

5.      The FDC Act and the Substances Act are key tools used by the U.S. government to ensure the safety of drugs sold in the U.S.  If drugs do not come from U.S. pharmacies, the FDA has no way to ensure that those drugs comply with its labeling, manufacturing, storage, and distribution requirements.  Often, drugs originating from non-U.S. sources are not dispensed to patients pursuant to valid prescriptions.  Instead, many times an online user does not even need to see a doctor, and instead simply has to fill out an online form.  This allows dangerous and addictive drugs to get into the hands of users without proper U.S. or health provider oversight.

6.      Critically, compliance with the FDC Act and the Substances Act is not elective – rather, it is mandatory.  Further, compliance with the FDC Act and the Substances Act is a legal duty known and readily knowable to Defendants (defined herein).

7.      On August 19, 2011, it was revealed that Google had entered into a non-prosecution agreement (the "Non-Prosecution Agreement") with the U.S. Department of Justice (the "DOJ") arising from the DOJ's "investigation into the Company's acceptance of advertisements placed by online pharmacy advertisers that did not comply with United States law regarding the importation and dispensation of prescription drugs."  In connection with the settlement, Google was forced to forfeit

---

[2] Not all prescription drugs are listed as controlled prescription drugs in the Substances Act.  Many prescription drugs are listed in Schedules I through V of the Substances Act because of their high potential for abuse or addiction.  Schedule I through V prescription drugs primarily are narcotic pain relievers and central nervous system depressants and stimulants.

1    *$500 million*.  As the DOJ's press release announcing the settlement made clear, the Company's $500

2  million settlement payment represented (in part) "the gross revenue received by Google as a result of

3  Canadian pharmacies advertising through Google's AdWords program."  The press release issued by

4  the DOJ also made clear that this forfeiture was one of the largest ever in the history of the United

5

6  States.

7          8.      Indeed, as *CNNMoney.com* had reported in an article published on July 1, 2011 entitled

8  "Google Braces For Fine Over Illegal Drug Ads" (the "CNNMoney Article"), a half-billion dollar fine

9  would set the record for ***the largest such penalty in U.S. history*** for the conduct at issue.  Moreover, the

10  CNNMoney Article had revealed that in 2008, a letter was sent to defendant Eric E. Schmidt

11  ("Schmidt"), who at the time was Google's Chief Executive Officer ("CEO") and Chairman, by Joseph

12  A. Califano, Jr. ("Califano") (head of the National Center on Addiction and Substance Abuse at

13  Columbia University ("CASA")), specifically warning that Google was profiting from ads for illegal

14

15  drug sales.

16          9.      Peter Neronha ("Neronha"), the U.S. Attorney for the District of Rhode Island, has

17  explained that the conduct underlying the Non-Prosecution Agreement was not the product of "two or

18  three rogue employees at the customer service level…***this was a corporate decision***."  Further, Neronha

19  specifically identified defendant Larry Page ("Page"), Google's current CEO and a longtime director of

20  the Company, as being aware of the wrongdoing, stating: "We know it from the investigation.  We

21  simply know it from the documents we reviewed, witnesses that we interviewed, that ***Larry Page knew***

22

23  ***what was going on***."

24          10.     The true facts, which were known by Defendants, but concealed from the public, were as

25  follows:

26             a.   Defendants caused or allowed the Company to repeatedly accept and/or assist in

27                 optimizing advertisements placed by online Canadian pharmacy advertisers that

28

- 3 -

violated the FDC Act and/or the Substances Act;

    b.   Defendants caused the Company's financial statements filed with the SEC to be false and misleading when issued, because Defendants failed to disclose that they caused Google to derive significant revenues (and profits) resulting from improper and illegal advertising by Canadian pharmacies; and

    c.   As a result of Defendants' actions, Google would be forced to forfeit a substantial sum of money to the U.S. Government.

11.    Indeed, as a result of Defendants' illicit activities, the Company has been forced to forfeit $500 million to the DOJ.

12.    Accordingly, as a result of Defendants' breaches, the Company has been damaged.

13.    In light of the events described above, on September 8, 2011, Plaintiff issued a demand (the "Demand") pursuant to Del. Ch. R. 23.1 on the Board to undertake an independent internal investigation into Defendants' violations of Delaware and/or federal law, and to commence a civil action against each of the Defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties. A true and correct copy of the Demand is attached hereto at Exhibit "A."

14.    On September 27, 2011, Plaintiff's counsel received a letter from Kent Walker, Google's Senior Vice President and General Counsel, acknowledging the receipt of the Demand. A true and correct copy of this letter is attached hereto as Exhibit "B." This letter stated that the Demand would be forwarded to the Board, and stated that "I or they will get back to you." It has been nearly seven months since the Board received the Demand, however, and in that time the Board has failed to provide any substantive response to the Demand. The Board's non-response is a functional refusal of the Demand.

15.    Clearly, the Board's failure to properly respond to the Demand is improper under

- 4 -

Delaware law and demonstrates the Board's lack of diligence and good faith. The Board has ignored the Demand, and accordingly, this derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## INTRADISTRICT ASSIGNMENT

19.     A substantial part of the events or omissions which give rise to the claims in this action occurred in the city of Mountain View, in the County of Santa Clara, and as such this action is properly assigned to the San Jose Division of this Court.

## THE PARTIES

20.     Plaintiff is a current shareholder of Google and has been continuously since February 2008. Plaintiff is a citizen of Texas.

- 5 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT

21.    Nominal party Google is a Delaware corporation with its executive offices located at 1600 Amphitheatre Parkway, Mountain View, California 94043. According to its public filings, Google is the world's largest internet search and technology company, focusing on organizing the world's information and making it universally accessible and useful. Google generates revenues primarily by offering various advertising services that permit advertisers (including Canadian online pharmacies) to post their advertising message and a link to their website above and next to search results in response to search queries relevant to the advertiser.

22.    Defendant Page has served as the Company's CEO since April 4, 2011. In addition, defendant Page is a Google founder, and has served as a director since September 1998. Previously, defendant Page served as President, Products from July 2001 to April 3, 2011, as CEO from September 1998 to July 2001, and as Chief Financial Officer ("CFO") from September 1998 to July 2002. Upon information and belief, defendant Page is a citizen of California.

23.    Defendant Sergey Brin ("Brin") has served as a director of the Company since September 1998. In addition, defendant Brin is a founder of the Company, served as President, Technology from July 2001 to April 3, 2011, and as President and Chairman of the Board from September 1998 to July 2001. Upon information and belief, defendant Brin is a citizen of California.

24.    Defendant Schmidt has served as a director of the Company since 2001, and has served as Executive Chairman of the Board since April 4, 2011. In addition, defendant Schmidt served as the Company's CEO from July 2001 to April 3, 2011, and as Chairman from March 2001 to April 2004, and again from April 2007 to April 3, 2011. Upon information and belief, defendant Schmidt is a citizen of California.

25.    Defendant L. John Doerr ("Doerr") has served as a director of the Company since May 1999. Upon information and belief, defendant Doerr is a citizen of California.

26.    Defendant John L. Hennessy ("Hennessy") has served as a director of the Company

- 6 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT

since April 2004 and as Lead Independent Director since April 2007.  Upon information and belief, defendant Hennessy is a citizen of California.

27.    Defendant Ann Mather ("Mather") has served as a director of the Company since November 2005.  Upon information and belief, defendant Mather is a citizen of California.

28.    Defendant Paul S. Otellini ("Otellini") has served as a director of the Company since April 2004.  Upon information and belief, defendant Otellini is a citizen of California.

29.    Defendant K. Ram Shriram ("Shriram") has served as a director of the Company since September 1998.  Upon information and belief, defendant Shriram is a citizen of California.

30.    Defendant Shirley M. Tilghman ("Tilghman") has served as a director of the Company since October 2005.  Upon information and belief, defendant Tilghman is a citizen of New Jersey.

31.    Defendant Nikesh Arora ("Arora") has served as the Company's Senior Vice President and Chief Business Officer since January 2011.  In addition, defendant Arora served as the Company's President, Global Sales Operations & Business Development from April 2009 to December 2010 and as President, International Operations prior to that.  Upon information and belief, defendant Arora is a citizen of California.

32.    Defendant Patrick Pichette ("Pichette") has served the Company's Senior Vice President and CFO since 2008.  Upon information and belief, defendant Pichette is a citizen of California.

33.    Collectively, defendants Page, Brin, Schmidt, Doerr, Hennessy, Mather, Otellini, Shriram, Tilghman, Arora and Pichette shall be collectively referred to herein as the "Defendants."

## DEFENDANTS' DUTIES

34.    By reason of their positions as officers, directors, and/or fiduciaries of Google and because of their ability to control the business and corporate affairs of Google, Defendants owed Google and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Google in a fair, just, honest, and equitable

- 7 -

manner. Defendants were and are required to act in furtherance of the best interests of Google and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Google and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     Defendants, because of their positions of control and authority as directors and/or officers of Google, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Google, each of the Defendants had knowledge of material non-public information regarding the Company.

36.     To discharge their duties, the officers and directors of Google were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Google were required to, among other things:

      a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

      c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

- 8 -

# SUBSTANTIVE ALLEGATIONS

37.     According to its public filings, Google is the world's largest internet search and technology company, focusing on organizing the world's information and making it universally accessible and useful. Google generates revenues primarily by offering various advertising services that permit advertisers (including Canadian online pharmacies) to post their advertising message and a link to their website above and next to search results in response to search queries relevant to the advertiser.

38.     The Company's largest advertising program, AdWords, displays sponsored advertisements in response to queries by the Company's search engine users. In addition, advertisers are able to "geo-target" their advertising campaigns, selecting the specific countries where the advertisements will display. In return for these services, advertisers pay fees to Google for each advertisement.

39.     Notably, as a corporation headquartered and operating in the U.S., Google is subject to all U.S. federal laws. Enacted by the U.S. Congress in 1938, the FDC Act gives authority to the FDA to oversee the safety of food, drugs, and cosmetics. Among other things, the FDC Act prohibits the introduction or delivery for introduction of any drug into interstate commerce, or the causing thereof. In almost all circumstances, the shipment of prescription drugs from pharmacies outside of the U.S. violates the FDC Act. Similarly, the Substances Act, which was enacted by U.S. Congress in 1970, prohibits such conduct with regard to controlled prescription drugs.

40.     The FDC Act and the Substances Act are key tools used by the U.S. government to ensure the safety of drugs sold in the U.S. If drugs do not come from U.S. pharmacies, the FDA has no way to ensure that those drugs comply with its labeling, manufacturing, storage, and distribution requirements. Often, drugs originating from non-U.S. sources are not dispensed to patients pursuant to valid prescriptions. Instead, many times an online user does not even need to see a doctor, and instead simply has to fill out an online form. This allows dangerous and addictive drugs to get into the hands of

- 9 -

1    users without proper U.S. or health provider oversight.

2        41.    Critically, compliance with the FDC Act and the Substances Act is not elective – rather,

3    it is mandatory.  Further, compliance with the FDC Act and the Substances Act is a legal duty known

4    and readily knowable to Defendants.

5
6        42.    Sometime prior to March 13, 2003[3], Defendants caused Google to contact the National

7    Association of Boards of Pharmacy ("NABP"), the preeminent professional organization in the United

8    States that supports the state boards of pharmacy in protecting public health, regarding "the ability of

9    rogue pharmacy-related Web sites to advertise their services on Internet search engines."  The NABP

10   responded by warning Google's Healthcare Vertical Market Manager, Mary Ann Belliveau, about the

11   dangers of illegal online pharmacies, the misleading nature of Google's "sponsored links" for these sites,

12   and the U.S. federal laws which Google may be violating.  The NABP stated that it was "deeply

13   concerned that these rogue Internet [pharmacy] sites could be a front for criminals seeking to introduce

14   adulterated medications, counterfeit drugs, or worse, to the American market."

15

16       43.    The NABP recommended that Google limit its sponsored links to only pharmacies

17   certified by the Verified Internet Pharmacy Practices Sites ("VIPPS") program. VIPPS is the leading

18   pharmacy accreditation service in the country.  It was created by a coalition of state and federal

19   regulatory associations, professional associations, and consumer advocacy groups who developed the

20   criteria which VIPPS uses to accredit pharmacies. VIPPS conducts on-site inspections of pharmacies, has

21   a stringent standard against the issuance of prescriptions based on an online consultation without a

22   physical examination and, importantly, does not certify Canadian online pharmacies that ship to U.S.

23
24   patients.

25
---
26   [3] Notably, the following defendants have served in a directorial and/or executorial capacity at Google
     since 2003: defendant Page, defendant Brin, defendant Schmidt, defendant Doerr and defendant
27   Shriram.

28                                              - 10 -

44.     Defendants rejected the conclusions in the NABP's letter.  Moreover, Defendants already knew that accepting ads from illegal online pharmacies was illegal.   Beginning in 2004, Defendants caused Google to actively block pharmacies in countries other than Canada from peddling prescription drugs online in the United States.  Even though Defendants caused Google to block advertisements from pharmacies in foreign countries, they inexplicably allowed Canadian pharmacies to advertise prescription drugs to Google users in the United States. The Non-Prosecution Agreement later confirmed this fact, stating, "[a]lthough the Company took steps to block pharmacies in countries other than Canada from advertising in the United States through AdWords, the Company continued to allow Canadian pharmacy advertisers to geo-target the United States in their AdWords advertising campaigns." Furthermore, in spite of the known risks, Defendants did not cause Google to employ VIPPS until 2009 – only after Defendants became aware of an investigation by the Rhode Island U.S. Attorney's Office and the FDA's Office of Criminal Investigations (the "FDA/OCI").

45.     The investigation by the U.S. Attorney's Office in Rhode Island and the FDA/OCI Rhode Island Task Force confirmed that Defendants knew in 2003 that online Canadian pharmacies were advertising prescription drugs to Google users in the United States through Google's AdWords advertising program in violation of the FDC Act and the Substances Act.

46.     In fact, employees at all levels of the Company knew that U.S. consumers were making online purchases of prescription drugs from Canadian pharmacies. For example, in a November 18, 2003 e-mail, a Google employee discussed the advertising budgets of several Canadian online pharmacy advertisers and noted that "[a]ll ship from Canada into the US via Express Mail." On July 22, 2004, Sheryl Sandberg ("Sandberg"), Google's Vice President of Global Online Sales and Operations, testified before the United States Senate's Permanent Subcommittee on Investigations of the Committee on Governmental Affairs about online pharmaceutical advertising.  In her testimony, Sandberg admitted that Google "recognize[s] that there are bad actors on the Internet, including unlicensed online pharmacies

- 11 -

that peddle unsafe and counterfeit products." In an August 23, 2005 e-mail, an employee in Google's policy group stated that "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

47.     Further, the Company received repeated warnings from numerous sources concerning the likelihood that rogue pharmacies targeted their advertising toward Google users in the United States. For example, on approximately December 1, 2003, Peter J. Pitts, the FDA's Associate Commissioner for External Affairs, stated that the FDA was "literally placing calls to the search engines trying to get a meeting going" concerning their business dealings with online pharmacies. Around the same time, Google was also contacted by the father of a teenage boy who was hospitalized after he used the Company's search engine to locate and order Vicodin, which the Company said it took "very seriously."

48.     While mounting public and private pressure forced Defendants to make minor improvements to Google's advertising policy, they refused to use a robust system like the one offered by VIPPS. On December 1, 2003, Defendants caused Google to announce that it would use a third-party company to screen out ads from rogue pharmacies that do not require prescriptions. The release never mentioned how Defendants would cause Google to treat Canadian pharmacies in the new plan. Defendants' decision only came several weeks after rival companies, Yahoo and Microsoft, began banning similar advertising. Furthermore, the FDA began publicly pressuring search engines to accept drug ads from only licensed Internet pharmacies, and the Senate Permanent Subcommittee on Investigations began probing the role of companies that advertise illegal prescription drugs – before which Sandberg testified.

49.     Despite knowing that it was illegal for pharmacies to ship prescription drugs to the U.S. from Canada, and that U.S. consumers were purchasing prescription drugs online advertised through Google's AdWords, Defendants consciously endorsed the Company's improper business strategy of permitting Canadian pharmacies to advertise through AdWords and direct their advertisements at U.S.

- 12 -

customers. Specifically, Defendants permitted Google employees to assist Canadian online pharmacy advertisers in creating advertisements that were designed to evade the internal controls put in place to detect and prevent foreign pharmaceutical companies from advertising on Google. It is well established that causing a company to operate in violation of the law is a breach of a fiduciary's duties of loyalty and good faith. Defendants' instruction or conscious disregard that the Company break the law in order to maximize short term profits is a breach of their duties of loyalty and good faith.

50.     In 2004, despite the NABP's warnings and widespread criticisms, Defendants caused Google to announce that it would actively block ads from pharmacies in other countries, but it would still continue permitting online Canadian pharmacies to advertise through AdWords. Defendants put this policy into practice through the retention of a third-party verification service, SquareTrade, Inc. ("SquareTrade"), to verify that online pharmacy advertisers were licensed in at least one state in the United States or Canada. SquareTrade, which offers its seal of approval for a wide range of online businesses ranging from cars to realtors, had a very low standard for approval of pharmacies. But SquareTrade was merely a facade.

51.     Unlike VIPPS, SquareTrade did not conduct on-site inspections and simply required pharmacies seeking to advertise through AdWords to self-certify that they would act in accordance with applicable U.S. laws and regulations. Moreover, SquareTrade certified online pharmacies as long as they were licensed in one state in the United States *or in Canada*. Consequently, Canadian online pharmacies could advertise prescriptions through AdWords to U.S. customers. The use of SquareTrade's ineffective verification further demonstrates Defendants' conscious decision to allow Canadian pharmacies to advertise to U.S. citizens even while causing the Company to actively block most other countries from peddling prescription drugs online to consumers in the United States. These duplicitous decisions reflect Defendants' knowledge that it was illegal for pharmacies to ship prescription drugs to the United States from outside the country.

- 13 -

52.     Google's sponsorship of Canadian pharmacy ads brought widespread criticism. On June 9, 2004, *The Wall Street Journal* ("WSJ") reported that Defendants' decision to allow Google to continue to carry Canadian ads drew criticism from U.S. regulators and angered U.S. druggists. Peter J. Pitts, an FDA official, explained he was "disappointed" in this decision, criticizing the pursuit of illegal profit: "You can't make value judgments based on what is or is not in your financial interests . . . ." Similarly, state pharmacy boards disapproved of Defendants' decision, calling on Google and other search providers to use VIPPS to screen out Canadian pharmacies – just as the NABP advised Google to do in March 2003, described *supra*.

53.     The need to resist sponsoring ads by rogue pharmacies was well-known to Defendants. Two high-level Google officials appeared before Congressional committees claiming that Google guarded against such advertisements. Sandberg attempted to tout Google's "proactive" use of SquareTrade in her testimony to the Senate's Permanent Subcommittee on Investigations on July 22, 2004. Despite Sandberg's characterization of SquareTrade as using a "rigorous" verification process, SquareTrade's self-certification paled in comparison to VIPPS's stringent standards.  On December 13, 2005, a second high-ranking Company official, Andrew McLaughlin, then Google's Director of Global Public Policy, again hyped SquareTrade's verification process in similar testimony to the House Subcommittee on Oversight and Investigations.

54.     Although SquareTrade-certified pharmacies were supposedly in compliance with pharmacy laws and practices, Defendants knew that many Canadian online pharmacies were committing rampant violations. Many of these pharmacies distributed prescription drugs, including controlled prescription drugs, based on an online consultation, rather than a valid prescription from a treating medical practitioner despite SquareTrade's purported dispensing requirements. As the Non-Prosecution Agreement makes clear, the Defendants were on notice that many of these pharmacies charged a premium for doing so, because individuals seeking to obtain prescription drugs without a valid

- 14 -

prescription were willing to pay higher prices for the drugs.

55.    For example, in July 2004, Defendants learned that online pharmacies were circumventing SquareTrade's certification process by intentionally avoiding the use of pharmaceutical terms in the text of their AdWords advertisements, while using the same terms as advertising "keyword" terms. A keyword is a specific word or phrase used by an advertiser that Google uses to trigger the display of advertisements in response to a user's query. Advertisers bid, in an auction-like format, on keywords in order to have their advertisements appear when the user enters the selected keywords into the Company's search engine. Once Google began using SquareTrade, it conducted a manual review of non-certified online pharmacy advertisements only if a pharmaceutical term appeared in the text of the advertisement. Defendants knew, however, that some pharmacy advertisers, including some from Canada, avoided this review by using the prescription drug terms as keywords only and not in advertising text.

56.    Defendants also knew that SquareTrade-certified Canadian pharmacies broke their "promise" not to target U.S. consumers. From 2003 through 2009, Defendants caused Google to provide customer support to a number of these Canadian online pharmacy advertisers, including assisting them in placing and optimizing their AdWords advertisements, despite knowing that these advertisers were attempting to actively violate U.S. federal drug laws. For example, on or about April 23, 2004, a Google employee based in Canada stated that, in connection with the advertisements of a large Canadian pharmacy, "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind." About a month later, on or about June 4, 2004, the same employee emailed a member of the Company's policy group and stated "[t]he Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

57.    Moreover, Defendants permitted Canadian pharmacy advertisers to intentionally geo-target the United States in their AdWords campaigns. Defendants were aware of this practice, according

- 15 -

to an August 23, 2005 e-mail by an employee in the Company's policy group that stated "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

58.    On March 30, 2005, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2004 (the "2004 Form 10-K"). The 2004 Form 10-K included representations about the Company's disclosure and internal controls, as well as Sarbanes-Oxley ("SOX") certifications, signed by defendant Schmidt and then-CFO George Reyes ("Reyes"), which stated as follows:

I, [Eric E. Schmidt/George Reyes], certify that:

1.    I have reviewed this annual report on Form 10-K of Google Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in

- 16 -

this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)       Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

                    *        *        *

I, [Eric E. Schmidt/George Reyes], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2003, that the Annual Report of Google Inc. on Form 10-K for the fiscal year ended December 31, 2004 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in this Form 10-K fairly presents in all material respects the financial condition and results of operations of Google Inc.

59.      The 2004 Form 10-K also asserted the following regarding Google's internal controls:

ITEM 9A.       CONTROLS AND PROCEDURES

(a) Evaluation of disclosure controls and procedures.
Our management, with the participation of our chief executive officer and chief

- 17 -

financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 as of the end of the period covered by this Annual Report on Form 10-K. The evaluation included certain internal control areas in which we have made and are continuing to make changes to improve and enhance controls. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on that evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

(b) Changes in internal control over financial reporting.
There were no changes in our internal control over financial reporting that occurred during the period covered by this Annual Report on Form 10-K that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Since 2003 we have invested significant resources to comprehensively document and analyze our system of internal control over financial reporting. We have identified areas requiring improvement, and we are in the process of designing enhanced processes and controls to address issues identified through this review. Areas of improvement include streamlining and standardizing our domestic and international billing and other processes, further limiting internal access to certain data systems and continuing to improve coordination and communication across business functions. We plan to continue this initiative as well as prepare for our first management report on internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002 for the annual period ending December 31, 2005, which may result in changes to our internal control over financial reporting.

60.    When Google changed third-party verification providers in 2006, the Company continued to receive reports that online Canadian pharmacies were breaking U.S. law with Google's assistance. PharmacyChecker.com LLC ("PharmacyChecker"), Google's new third-party verification provider, purportedly certified advertisers of non-controlled prescription drugs, including distributors located in

- 18 -

Canada. Defendants, however, knew that PharmacyChecker was not effective, and that VIPPS was still a viable option.

61.    On March 16, 2006, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2005 (the "2005 Form 10-K").  The 2005 Form 10-K included representations about the Company's internal controls, as well as SOX required certifications, substantially similar to those contained in the 2004 Form 10-K, but with the following addition to Item 9A:

> c) Management's report on internal control over financial reporting.
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2005. Management reviewed the results of their assessment with our Audit Committee. Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included in Part IV, Item 15 of this Form 10-K.

62.    On July 7, 2008, Califano, a former U.S. Secretary of Health, Education, and Welfare, and head of CASA, described PharmacyChecker's faults and warned defendant Schmidt, then Google's Chairman and CEO, about Google's illicit revenue:

> Although Google reports using a company called PharmacyChecker to screen out rogue pharmacies, CASA was able to find prominent displays of ads for rogue Internet pharmacies in a Google search for controlled drugs included in our analysis. This suggests that Google is profiting from advertisements for illegal sales of controlled prescription drugs online.

63.    Califano advised Defendants to take immediate action to "[b]lock all advertisements . . . that do not come from licensed or certified online pharmacies;" "[s]creen such sites from Internet searches;" and "[p]rovide warnings that sale and purchase of controlled drugs over the Internet from unlicensed pharmacies and physicians without valid prescriptions are illegal." Califano enclosed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT

CASA's 2008 report entitled "You've Got Drugs! V: Prescription Drug Pushers on the Internet," which highlighted the fact that approximately 85% of websites selling controlled prescription drugs did not require a legitimate prescription in 2007 and 2008. The CASA report also mentioned various verification programs: VIPPS employed a "rigorous" program, whereas PharmacyChecker's process was "far from perfect."

64.    Likewise, in a December 23, 2008 letter to defendant Schmidt, the NABP again recommended replacing Google's third-party verification service with one that actually adhered to pharmacy laws and practice standards. One of PharmacyChecker's primary flaws was that it certified sites that did not require a valid prescription and sourced their prescriptions from outside the U.S in contravention of U.S. law. Moreover, the NABP warned defendant Schmidt that "your sponsorship of these search results, and your third-party verification service's certification of these Web sites, aids in a business practice that is contrary to US law, unsafe, and deceptive to US patients."

65.    The NABP explained that Canadian pharmacists selling drugs to the United States online could skirt Canadian regulation. Furthermore, the NABP also explained that many of the prescription drugs originate in third-world countries, "a practice that would not be considered lawful or safe were the final customer within Canada, or if a US pharmacy were dispensing prescription drugs to a US resident."

66.    A report published in 2009 by Bryan A. Liang ("Liang"), a California Western School of Law Professor, roundly criticized PharmacyChecker, finding that although PharmacyChecker purportedly "verifies" the legitimacy of online pharmacies, "little verification of potential advertisers actually takes place." As a result, Google and other search engines were profiting from the online ads of illegal drug sellers, while at the same time "exert[ing] very little effort to ensure that online drug sellers from which they obtain advertisement revenue are legitimate." Liang stated in the WSJ on May 21, 2011 that "[o]n the basis of our analysis, I think [Google and other search providers] were turning a blind-eye . . . . They were making a lot of money on this."

- 20 -

67.    By July 2004, Defendants were on notice that online pharmacies were circumventing the SquareTrade and PharmacyChecker certification process by intentionally avoiding the use of certain pharmaceutical terms in the text of their AdWords advertisements, while using these same terms as advertising "keyword" terms, explained supra. Once the Defendants caused the Company to begin using SquareTrade, and continuing throughout the period during which the Company used PharmacyChecker, Defendants caused the Company to conduct manual review of non-certified online pharmacy advertisements only if a pharmaceutical term appeared in the text of the advertisement.

68.    Additionally, Defendants knew or recklessly disregarded that the Canadian online pharmacies, with the assistance of Google employees, were continuing to employ the same tricks to circumvent PharmacyChecker's certification process as they had when the Company used SquareTrade's services, including avoiding manual review of the advertisements by using pharmaceutical terms as keywords only and not in advertising text. For example, in a February 13, 2008 e-mail, a member of the Company's policy group stated, "[t]he only ads that are getting blocked are those with explicit pharma terms in the ad texts; the shady, fraudulent advertisers know not to do this." After Defendants became aware of the Government's investigation, they made changes to Google's systems in order to flag for review all ads that had prescription drug terms as keywords.

69.    Some pharmacy advertisers that did not qualify for certification were also able to advertise through AdWords by changing their geographic targets and avoiding the certification process altogether. These online pharmacy advertisers initially prevented their AdWords advertisements from being run in the United States, so that they would not be required to obtain a SquareTrade or PharmacyChecker certification. Once the advertisements began to run on the Company's search engine, however, the pharmacies would change the geo-targeting of the advertisements so that they would appear in the United States in response to queries by U.S. users of the Company's search engine. Although Defendants knew that some online pharmacies later changed the geo-targeting of their AdWords

- 21 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT

advertising in order to avoid the certification requirements, Defendants did nothing to prevent or monitor any changes to the online pharmacies' geo-targeting practices until after becoming aware of the DOJ's investigation.

70.    On March 1, 2007, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2006 (the "2006 Form 10-K"). The 2006 Form 10-K included representations about the Company's internal controls, as well as SOX required certifications, substantially similar to those contained in the 2005 Form 10-K.

71.    In 2008, CASA published a report that found that 85% of the online pharmacies advertising controlled drugs on search engines did not require a valid prescription. Also in 2008, a NABP study estimated that 96% of internet drug outlets appeared to be in violation of pharmacy-related laws or standards. In December 2008, the NABP wrote a letter to Google urging it to drop PharmacyChecker as its third-party verification service, noting that the Company had let through several advertisers "that source their prescription drugs from various locations outside of the United States . . . which is contrary to US law." The NABP also specifically advised Google that the importation of prescription drugs from foreign countries is illegal.

72.    Despite these multiple warnings, Defendants continued to allow Canadian online pharmacies to use AdWords until 2009. Defendants also caused Google to continue using PharmacyChecker until 2009, despite the existence of superior VIPPS service.

73.    It was only after Defendants learned in 2009 that the DOJ, the Rhode Island U.S. Attorney's Office, and the FDA/OCI, were investigating Google that they took any significant steps to prevent the unlawful sale of prescription drugs by online Canadian pharmacies to U.S. consumers. Defendants' quick response after learning about the investigation shows that they could have, at any time of the six-year long scheme, stopped causing the Company to assist online pharmacies in violating U.S. federal law.

74.     Among other things, on February 9, 2010, Defendants caused Google to finally update its Pharmacy Policy in the United States and Canada to require online pharmacy advertisers to be certified by VIPPS.  The updated Pharmacy Policy went into effect on February 23, 2010.  The updated Pharmacy Policy stated the following, in relevant part:

**Only VIPPS and CIPA certified pharmacies will be allowed to advertise**
We've made the decision to further restrict the ads we accept for online pharmacy sites in the U.S. and Canada. Starting at the end of this month, Google AdWords will only accept ads from online pharmacies in the U.S. that are accredited by the National Association Boards of Pharmacy VIPPS program, and from online pharmacies in Canada that are accredited by the Canadian International Pharmacy Association (CIPA).

**Pharmacies can only target ads within their country**
These pharmacies may only target ads to users in the country in which they are accredited. This policy change does not affect our online pharmacy policy for countries outside the U.S. and Canada.

Accordingly, we'll no longer be using any 3rd party verifier of online pharmacies other than VIPPS and CIPA. AdWords advertisers who aren't accredited by VIPPS and CIPA will no longer see their online pharmacy ads displayed once this policy change comes into effect.

75.     In addition, Defendants caused Google to retain an independent company to enhance its back-end sweeps, which were designed to detect pharmacy advertisers exploiting flaws in the Company's screening systems. Finally, Defendants caused Google to begin suing pharmacy advertisers that violated the Company's terms of use and reporting suspected illegal pharmacies to the FDA.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

76.     On February 15, 2008, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2007 (the "2007 Form 10-K").  The 2007 Form 10-K included representations about the Company's internal controls, as well as SOX required certifications, substantially similar to those contained in the 2005 Form 10-K.

77.     On February 13, 2009, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2008 (the "2008 Form 10-K").  The 2008 Form 10-K included

- 23 -

representations about the Company's internal controls, as well as SOX required certifications, substantially similar to those contained in the 2005 Form 10-K, except for the fact that the SOX CFO certification was signed by defendant Pichette.

78.     On February 12, 2010, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2009 (the "2009 Form 10-K"). The 2009 Form 10-K included representations about the Company's internal controls, as well as SOX required certifications, substantially similar to those contained in the 2008 Form 10-K.

79.     On February 11, 2011, Defendants caused Google to file with the SEC a Form 10-K for the Fiscal Year ended December 31, 2010 (the "2010 Form 10-K"). The 2010 Form 10-K included representations about the Company's internal controls, as well as SOX required certifications, substantially similar to those contained in the 2008 Form 10-K.

## THE TRUTH BEGINS TO EMERGE

80.     On May 10, 2011, in the Company's Quarterly Report on Form 10-Q for the first quarter of 2011, Defendants caused the Company to reveal that it had been forced to set aside $500 million for a possible resolution of the DOJ's investigation.

81.     As the CNNMoney Article subsequently reported on July 1, 2011, a half-billion dollar fine would set the record for *the largest such penalty in U.S. history* for the conduct at issue. Moreover, the CNNMoney Article revealed that in 2008, a letter was sent to defendant Schmidt by Califano, specifically warning that Google was profiting from ads for illegal drug sales.

82.     On August 19, 2011, it was revealed that Defendants had caused Google to enter into the Non-Prosecution Agreement with the DOJ arising from the DOJ's "investigation into the Company's acceptance of advertisements placed by online pharmacy advertisers that did not comply with United States law regarding the importation and dispensation of prescription drugs." In connection with the settlement, Google was forced to forfeit *$500 million*.

- 24 -

83.    According to Defendants and federal authorities, as set forth in the Non-Prosecution Agreement, *Defendants were aware of the illegality associated with the importation of prescription drugs into the U.S.* In fact, the parties to the Non-Prosecution Agreement agreed upon, *inter alia,* the following:

- As early as 2003, the Company was aware that in most circumstances it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the U.S. from Canada. *For example, in March 2003 and again in December 2008, the National Association of Boards of Pharmacy advised the Company that the importation of prescription drugs from foreign countries is illegal.*

- *The Company was aware that importation of prescription drugs to consumers in the U.S. is almost always unlawful* because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved and because the drugs may not meet FDA's labeling requirements, may not have been manufactured, stored, and distributed under proper conditions, and may not have been dispensed pursuant to a valid prescription. While Canada had its own regulatory regime for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada, which lack adequate pharmacy regulations.

84.    Neronha, the U.S. Attorney for the District of Rhode Island, has explained that the conduct underlying the Non-Prosecution Agreement was not the product of "two or three rogue employees at the customer service level...*this was a corporate decision*." Further, Neronha specifically identified defendant Page, Google's current CEO and a longtime director of the Company, as being aware of the wrongdoing, stating: "We know it from the investigation. We simply know it from the documents we reviewed, witnesses that we interviewed, that *Larry Page knew what was going on*."

- 25 -

85.     Despite Defendants' knowledge of the federal mandates regulating the importation of prescription drugs, they caused Google to repeatedly accept and/or assist in optimizing advertisements placed by online Canadian pharmacy advertisers that violated the FDC Act and/or the Substances Act. As the Non-Prosecution Agreement provides (in pertinent part):

- *As early as 2003, the Company was on notice that online Canadian pharmacies were advertising prescription drugs to the Company's users in the United States through the Company's AdWords advertising program*. Although the Company took steps to block pharmacies in countries other than Canada from advertising in the United States through AdWords, the Company continued to allow Canadian pharmacy advertisers to geo-target the United States in their AdWords advertising campaigns. The Company knew that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies.  For example, in a November 18, 2003 email, a Company employee discussed the advertising budgets of several Canadian online pharmacy advertisers and noted that "[all] ship from Canada into the US via Express Mail." In an August 23, 2005 email, an employee in the Company's policy group stated, "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

\*\*\*

- *From 2003 through 2009, the Company provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements and improving the effectiveness of their websites*. For example, on or about April 23, 2004, a Google employee based in Canada reported in an email concerning the advertisements of a large Canadian pharmacy advertiser that "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind." On or about June 4, 2004, the same employee emailed a member of the Company's policy group and stated, "The Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

86.     In announcing the Non-Prosecution Agreement, the relevant DOJ press release stated, in pertinent part:

*Online search engine Google Inc. has agreed to forfeit $500 million for allowing online Canadian pharmacies to place advertisements through its AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States*, announced Deputy Attorney General James M. Cole; Peter F. Neronha, U.S. Attorney for the District of Rhode Island; and Kathleen Martin-Weis, Acting Director of the U.S. Food and Drug Administration's Office of Criminal Investigations (FDA/OCI). *The*

- 26 -

*forfeiture, one of the largest ever in the United States, represents the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program*, plus gross revenue made by Canadian pharmacies from their sales to U.S. consumers.

The shipment of prescription drugs from pharmacies outside the United States to customers in the United States typically violates the Federal Food, Drug and Cosmetic Act and in the case of controlled prescription drugs, the Controlled Substances Act. *Google was aware as early as 2003, that generally, it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada*.

***

"The Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," said Deputy Attorney General Cole. "This settlement ensures that Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."

*"This investigation is about the patently unsafe, unlawful, importation of prescription drugs by Canadian on-line pharmacies, with Google's knowledge and assistance, into the United States, directly to U.S. consumers,"* said U.S. Attorney Neronha. "It is about taking a significant step forward in limiting the ability of rogue on-line pharmacies from reaching U.S. consumers, by compelling Google to change its behavior. *It is about holding Google responsible for its conduct by imposing a $500 million forfeiture*, the kind of forfeiture that will not only get Google's attention, but the attention of all those who contribute to America's pill problem."

***

Under the terms of an agreement signed by Google and the government, *Google acknowledges that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the company accepts responsibility for this conduct*. In addition to requiring Google to forfeit $500 million, the agreement also sets forth a number of compliance and reporting measures which must be taken by Google in order to insure that the conduct described in the agreement does not occur in the future.

87.    On August 23, 2011, Google paid *$500 million* to federal authorities to resolve the DOJ's probe into its advertising practices.

88.    Thus, due to Defendants' breaches of fiduciary duty and other misconduct, Google has been severely damaged.

89.    The true facts, which were known by Defendants, but concealed from the public, were as follows:

- 27 -

a.   Defendants caused or allowed the Company to repeatedly accept and/or assist in optimizing advertisements placed by online Canadian pharmacy advertisers that violated the FDC Act and/or the Substances Act;

b.   Defendants caused the Company's financial statements filed with the SEC to be false and misleading when issued, because Defendants failed to disclose that they caused Google to derive significant revenues (and profits) resulting from improper and illegal advertising by Canadian pharmacies; and

c.   As a result of Defendants' actions, Google would be forced to forfeit a substantial sum of money to the U.S. Government.

## DERIVATIVE AND DEMAND ALLEGATIONS

90.   Plaintiff brings this action derivatively in the right and for the benefit of Google to redress the breaches of fiduciary duty and other violations of law by Defendants.

91.   Plaintiff will adequately and fairly represent the interests of Google and its shareholders in enforcing and prosecuting its rights.

92.   In light of Defendants' breaches of fiduciary duties described, *supra*, on September 8, 2011, Plaintiff issued the Demand pursuant to Del. Ch. R. 23.1 on the Board to undertake an independent internal investigation into Defendants' violations of Delaware and/or federal law, and to commence a civil action against each of the Defendants to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their beaches of fiduciary duties. *See* Exhibit "A".

93.   On September 27, 2011, Plaintiff's counsel received a letter from Kent Walker, Google's Senior Vice President and General Counsel, acknowledging the receipt of the Demand. *See* Exhibit "B". This letter stated that the Demand would be forwarded to the Board, and stated that "I or they will get back to you." It has been nearly seven months since the Board received the Demand, however, and

- 28 -

in that time the Board has failed to provide any substantive response to the Demand. The Board's non-response is a functional refusal of the Demand.

94.    Clearly, the Board's failure to properly respond to the Demand is improper under Delaware law and demonstrates the Board's lack of diligence and good faith. The Board has ignored the Demand, and accordingly, this derivative action should be allowed to proceed.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.    As alleged in detail herein, each of the Defendants had a duty to ensure that Google disseminated accurate, truthful and complete information to its shareholders.

97.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Google shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

98.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

99.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

100.    As alleged herein, each of the Defendants had a fiduciary duty to, among other things,

- 29 -

exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

101.    Defendants willfully ignored the obvious and pervasive problems with Google's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

102.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    Defendants owed and owe Google fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Google the highest obligation of good faith, fair dealing, loyalty and due care.

105.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

106.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Google has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

107.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

108.    Plaintiff, on behalf of Google, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT

COUNT IV

**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Google.

111.    Plaintiff, as a shareholder and representative of Google, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

COUNT V

**AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Google, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Google to misrepresent material facts regarding its financial position and business prospects.

114.    As a direct and proximate result of Defendants' abuse of control, Google has sustained significant damages.

115.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

116.    Plaintiff, on behalf of Google, has no adequate remedy at law.

COUNT VI

- 31 -

**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.    Defendants had a duty to Google and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Google.

119.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Google in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Google's affairs and in the use and preservation of Google's assets.

120.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Google to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Google, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Google.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Google to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a

- 32 -

1   vote a proposal to strengthen the Board's supervision of operations and develop and implement

2   procedures for greater shareholder input into the policies and guidelines of the Board;

3         C.     Awarding to Google restitution from Defendants, and each of them, and ordering

4   disgorgement of all profits, benefits and other compensation obtained by the Defendants;

5         D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable

6   attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7

8         E.     Granting such other and further relief as the Court deems just and proper.

9                                JURY DEMAND

10      Plaintiff demands a trial by jury.

11

12  DATED: April 10, 2012               THE WEISER LAW FIRM, P.C.

13

14

15                        KATHLEEN A. HERKENHOFF (168562)

16                        12707 High Bluff Drive, Suite 200
San Diego, CA 92130
17                        Telephone: 858-794-1441
Facsimile: 858-794-1450

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL AND UNJUST ENRICHMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
DAVID M. PROMISLOFF
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile:  (610) 408-8062

RYAN & MANISKAS, LLP
KATHARINE RYAN
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Telephone: 484/588-5516
Fax:  484/450-2582

Counsel for Plaintiff

- 34 -

## VERIFICATION

I, Judy Wang under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: 4/10/12

Judy Wang

# EXHIBIT A

# THE WEISER LAW FIRM, P.C.

WWW.WEISERLAWFIRM.COM

| | |
|---|---|
| PENNSYLVANIA | CALIFORNIA |
| 121 N. WAYNE AVENUE, SUITE 100 | 12707 HIGH BLUFF DRIVE, SUITE 200 |
| WAYNE, PA 19087 | SAN DIEGO, CA 92130 |
| TELEPHONE: (610) 225-2677 | TELEPHONE: (858) 794-1441 |
| FACSIMILE:  (610) 225-2678 | FACSIMILE:  (858) 794-1450 |

September 8, 2011

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Eric E. Schmidt
Executive Chairman of the Board
Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

      Re:    **Shareholder Demand Pursuant to Del. Ch. R. 23.1**

Dear Mr. Schmidt:

      This firm, along with Ryan & Maniskas, LLP, is counsel to Judy Wang (the "Stockholder"), a current stockholder of Google Inc. ("Google" or the "Company"). Pursuant to Del. Ch. R. 23.1, we write on behalf of the Stockholder to demand that the Company's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former directors and executive officers of the Company, including yourself ("Schmidt"), Larry Page ("Page"), Sergey Brin ("Brin"), L. John Doerr ("Doerr"), John L. Hennessy ("Hennessy"), Paul S. Otellini ("Otellini"), K. Ram Shriram ("Shriram"), Shirley M. Tilghman ("Tilghman"), Nikesh Arora ("Arora"), and Patrick Pichette ("Pichette"). Collectively, the foregoing executive officers and/or directors of the Company will be referred to herein as "Management."

      As you are aware, by reason of their positions as officers and/or directors of Google and because of their ability to control the business and corporate affairs of Google, Management owed and owes Google and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use their utmost ability to control and manage Google in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. The Stockholder believes that over a multi-year period, Management has violated these core fiduciary duty principles, which caused Google to suffer damages.

1

I.    BACKGROUND

    A.    <u>The Company, Its Business, and Certain Federal Laws Applicable Thereto</u>

        According to its public filings, Google is the world's largest internet search and technology company, focusing on organizing the world's information and making it universally accessible and useful.  Google generates revenues primarily by offering various advertising services that permit advertisers (including Canadian online pharmacies) to post their advertising message and a link to their website above and next to search results in response to search queries relevant to the advertiser.  The Company's largest advertising program, AdWords, displays sponsored advertisements in response to queries by the Company's search engine users.[1]  In addition, advertisers are able to "geo-target" their advertising campaigns, selecting the specific countries where the advertisements will display.  In return for these services, advertisers pay fees to Google for each advertisement.

        Notably, as a corporation headquartered and operating in the U.S., Google is subject to all federal laws.  Enacted by the U.S. Congress in 1938, the Federal Food, Drug, and Cosmetic Act (the "FDC Act") gives authority to the U.S. Food and Drug Administration (the "FDA") to oversee the safety of food, drugs, and cosmetics.  Among other things, the FDC Act prohibits the introduction or delivery for introduction of any drug into interstate commerce, or the causing thereof.  In almost all circumstances, the shipment of prescription drugs from pharmacies outside of the U.S. violates the FDC Act.  Similarly, the Controlled Substances Act (the "Substances Act"), which was enacted by U.S. Congress in 1970, prohibits such conduct with regard to controlled prescription drugs.[2]

        The FDC Act and the Substances Act are key tools used by the U.S. government to ensure the safety of drugs sold in the U.S.  If drugs do not come from U.S. pharmacies, the FDA has no way to ensure that those drugs comply with its labeling, manufacturing, storage, and distribution requirements.  Often, drugs originating from non-U.S. sources are not dispensed to patients pursuant to valid prescriptions.  Instead, many times an online user does not even need to see a doctor, and instead simply has to fill out an online form.  This allows dangerous and addictive drugs to get into the hands of users without proper U.S. or health provider oversight.

---

[1]  AdWords allows a potential advertiser to create text or image-based ads and display them online in a targeted manner.  The Company has created an advertising algorithm designed to target ads according to their relevance.  Basically, when a user enters a search into Google, these relevant ads appear beside the search results.  Most advertisers pay Google on a "cost-per-click" basis, meaning the more a person clicks on an ad the more Google is paid.  Google does, however, also offer a "cost-per-impression" basis, where an advertiser will pay the Company based on the number of times their ads appear on Google's websites.

[2]  Not all prescription drugs are listed as controlled prescription drugs in the Substances Act.  Many prescription drugs are listed in Schedules I through V of the Substances Act because of their high potential for abuse or addiction.  Schedule I through V prescription drugs primarily are narcotic pain relievers and central nervous system depressants and stimulants.

Critically, compliance with the FDC Act and the Substances Act is not elective – rather, it is mandatory. Further, compliance with the FDC Act and the Substances Act is a legal duty known and readily knowable by the members of Management.

**B.     Management Caused the Company to Violate Federal Laws**

On August 19, 2011, it was revealed that Google had entered into a non-prosecution agreement (the "Non-Prosecution Agreement") with the U.S. Department of Justice (the "DOJ") arising from the DOJ's "investigation into the Company's acceptance of advertisements placed by online pharmacy advertisers that did not comply with United States law regarding the importation and dispensation of prescription drugs." In connection with the settlement, Google was forced to forfeit *$500 million*.[3]

According to Management and federal authorities, as set forth in the Non-Prosecution Agreement, *Management was aware of the illegality associated with the importation of prescription drugs into the U.S.*[4] In fact, the parties to the Non-Prosecution Agreement agreed upon, *inter alia,* the following:

●     As early as 2003, the Company was aware that in most circumstances it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the U.S. from Canada. *For example, in March 2003 and again in December 2008, the National Association of Boards of Pharmacy advised the Company that the importation of prescription drugs from foreign countries is illegal.*

●     *The Company was aware that importation of prescription drugs to consumers in the U.S. is almost always unlawful* because the FDA cannot ensure the safety and effectiveness of foreign prescription drugs that are not FDA-approved and because the drugs may not meet FDA's labeling requirements, may

---

[3] On May 10, 2011, in the Company's Quarterly Report on Form 10-Q for the first quarter of 2011, Management revealed that they had been forced to set aside $500 million for a possible resolution of the DOJ's investigation. As *CNNMoney.com* subsequently reported in an article published on July 1, 2011 entitled "Google Braces For Fine Over Illegal Drug Ads" (the "CNNMoney Article"), a half-billion dollar fine would set the record for *the largest such penalty in U.S. history* for the conduct at issue.

[4] Peter Neronha, the U.S. Attorney for the District of Rhode Island, has explained that the conduct underlying the Non-Prosecution Agreement was not the product of "two or three rogue employees at the customer service level...*this was a corporate decision.*" Further, Mr. Neronha specifically identified Page, Google's current Chief Executive Officer ("CEO") and a longtime director of the Company, as being aware of the wrongdoing, stating: "We know it from the investigation. We simply know it from the documents we reviewed, witnesses that we interviewed, that *Larry Page knew what was going on.*" Moreover, the CNNMoney Article revealed that in 2008, a letter was sent to Schmidt by Joseph A. Califano, Jr., the President of Columbia University's Center for Addiction & Substance Abuse, *specifically warning that Google was profiting from ads for illegal drug sales.*

not have been manufactured, stored, and distributed under proper conditions, and may not have been dispensed pursuant to a valid prescription. While Canada had its own regulatory regime for prescription drugs, Canadian pharmacies that ship prescription drugs to U.S. residents are not subject to Canadian regulatory authority, and many sell drugs obtained from countries other than Canada, which lack adequate pharmacy regulations.

Despite Management's knowledge of the federal mandates regulating the importation of prescription drugs, between 2003 and 2009, under Management's direction and on their watch, Google repeatedly accepted and/or assisted in optimizing advertisements placed by online Canadian pharmacy advertisers that violated the FDC Act and/or the Substances Act. As the Non-Prosecution Agreement provides (in pertinent part):

- *As early as 2003, the Company was on notice that online Canadian pharmacies were advertising prescription drugs to the Company's users in the United States through the Company's AdWords advertising program.* Although the Company took steps to block pharmacies in countries other than Canada from advertising in the United States through AdWords, the Company continued to allow Canadian pharmacy advertisers to geo-target the United States in their AdWords advertising campaigns. The Company knew that U.S. consumers were making online purchases of prescription drugs from these Canadian online pharmacies. For example, in a November 18, 2003 email, a Company employee discussed the advertising budgets of several Canadian online pharmacy advertisers and noted that "[all] ship from Canada into the US via Express Mail." In an August 23, 2005 email, an employee in the Company's policy group stated, "the majority of Canadian Pharmacies are in business to drive pharmacy traffic from the United States to Canada" and "target the US in their geo-targeting."

***

- *From 2003 through 2009, the Company provided customer support to some of these Canadian online pharmacy advertisers to assist them in placing and optimizing their AdWords advertisements and improving the effectiveness of their websites.* For example, on or about April 23, 2004, a Google employee based in Canada reported in an email concerning the advertisements of a large Canadian pharmacy advertiser that "the Google team is proactively adjusting creative and optimizing with Square Trade policy in mind." On or about June 4, 2004, the same employee emailed a member of the Company's policy group and stated, "The Max team and [customer support] are sort of furiously working on creative to appease our new policy before approvals gets to them and disapproves."

In announcing its settlement with Google, in a press release, the DOJ stated in pertinent part:

*Online search engine Google Inc. has agreed to forfeit $500 million for allowing online Canadian pharmacies to place advertisements through its*

4

*AdWords program targeting consumers in the United States, resulting in the unlawful importation of controlled and non-controlled prescription drugs into the United States*, announced Deputy Attorney General James M. Cole; Peter F. Neronha, U.S. Attorney for the District of Rhode Island; and Kathleen Martin-Weis, Acting Director of the U.S. Food and Drug Administration's Office of Criminal Investigations (FDA/OCI). *The forfeiture, one of the largest ever in the United States, represents the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program*, plus gross revenue made by Canadian pharmacies from their sales to U.S. consumers.

The shipment of prescription drugs from pharmacies outside the United States to customers in the United States typically violates the Federal Food, Drug and Cosmetic Act and in the case of controlled prescription drugs, the Controlled Substances Act. *Google was aware as early as 2003, that generally, it was illegal for pharmacies to ship controlled and non-controlled prescription drugs into the United States from Canada.*

\*\*\*

"The Department of Justice will continue to hold accountable companies who in their bid for profits violate federal law and put at risk the health and safety of American consumers," said Deputy Attorney General Cole. "This settlement ensures that Google will reform its improper advertising practices with regard to these pharmacies while paying one of the largest financial forfeiture penalties in history."

*"This investigation is about the patently unsafe, unlawful, importation of prescription drugs by Canadian on-line pharmacies, with Google's knowledge and assistance, into the United States, directly to U.S. consumers,"* said U.S. Attorney Neronha. "It is about taking a significant step forward in limiting the ability of rogue on-line pharmacies from reaching U.S. consumers, by compelling Google to change its behavior. *It is about holding Google responsible for its conduct by imposing a $500 million forfeiture*, the kind of forfeiture that will not only get Google's attention, but the attention of all those who contribute to America's pill problem."

\*\*\*

Under the terms of an agreement signed by Google and the government, *Google acknowledges that it improperly assisted Canadian online pharmacy advertisers to run advertisements that targeted the United States through AdWords, and the company accepts responsibility for this conduct.* In addition to requiring Google to forfeit $500 million, the agreement also sets forth a number of compliance and reporting measures which must be taken by Google in order to insure that the conduct described in the agreement does not occur in the future.

On August 23, 2011, Google paid *$500 million* to federal authorities to resolve the DOJ's probe into its advertising practices. Thus, due to Management's breaches of fiduciary duty and other misconduct, Google has been severely damaged. Accordingly, Google is entitled to damages.

II.    DEMAND PURSUANT TO DEL. CH. R. 23.1

Based on the events described above, the Stockholder contends that Management: (i) breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of the Company's business; (ii) breached their fiduciary duty of good faith to establish and maintain adequate internal controls; and (iii) breached their fiduciary duties by disseminating false, misleading and/or incomplete information.[5]  As a result of the foregoing breaches of duty, Google has sustained damages.

Accordingly, pursuant to Del. Ch. R. 23.1, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

Pursuant to Delaware law, if within a reasonable time after receipt of this letter the Board has not commenced an action as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

THE WEISER LAW FIRM, P.C.

Robert B. Weiser

RYAN & MANISKAS, LLP

Richard A. Maniskas

cc:    Judy Wang

---

[5] Notably, each of the Company's Annual Reports on Form 10-K filed with the SEC since Google became a publicly-traded company in 2004 were false and misleading when issued, because Management failed to disclose that Google derived significant revenues (and profits) resulting from improper and illegal advertising by Canadian pharmacies. Indeed, as the DOJ's press release announcing the settlement made clear, the Company's $500 million settlement payment represented (in part) "the gross revenue received by Google as a result of Canadian pharmacies advertising through Google's AdWords program."

# EXHIBIT B

Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043



Main 650 253.0000
Fax 650 253.0001
www.google.com

VIA EXPRESS MAIL

Mr. Robert Weiser
The Weiser Law Firm
12707 High Bluff Drive
Suite 200
San Diego, CA 92130

Mr. Richard Maniskas
Ryan & Maniskas LLP
995 Old Eagle School Rd.
Suite 311
Wayne, PA 19087

September 27, 2011

Dear Sirs:

This is to acknowledge receipt of your letter dated September 8, 2011, which I received yesterday through our internal channels. I am forwarding the demand to our Board of Directors. I or they will get back to you on your demand. In the meantime, your demand does not provide sufficient information regarding your client, Judy Gold. Please advise us as to the amount and dates of her holdings in Google stock, and provide written confirmations reflecting that ownership.

Thank you,

Kent Walker
SVP & General Counsel
Google Inc.